Filed 1/25/16  In re D.P. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.P., a Person Coming Under the Juvenile Court Law. | B264501 (Los Angeles County Super. Ct. No. CK98935) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. HOLLY H. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marilyn Kading Martinez, Commissioner.  Affirmed.

Andre F.F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant Holly H.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant Michael P.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Holly H. (Mother) and Michael P. (Father) appeal from an order of the juvenile court under Welfare and Institutions Code section 366.26,[1] terminating their parental rights with respect to their child D.P. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 29, 2014, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition (Petition) on behalf of D.P., who was seven days old at the time. The Petition alleged that under subsection (b), Mother's and Father's drug use endangered D.P.

In the Detention Report filed the same day, DCFS reported that it received a referral on May 24, 2014, two days after D.P's birth, alleging general neglect against Mother. The referral stated that Mother was transient and had limited prenatal care and Mother's other child—D.P.'s half brother, Josiah, who was then two years old—was in DCFS foster placement with Mother having monitored visits only. The hospital, however, had not drug tested Mother and newborn D.P. at birth because Mother had initially denied DCFS involvement.[2] The report indicated that Father had a son by another mother but there were no allegations concerning Father.[3]

According to the Detention Report, a DCFS social worker interviewed Mother and Father at the hospital. Mother stated that her older child, Josiah, was in foster care due to her drug use, admitted a drug history for methamphetamine and marijuana use beginning 16 years ago, but denied recent drug use, stating she last used methamphetamine in May 2013 when Josiah was detained and last used marijuana in October 2013 when she was informed of her pregnancy with D.P. Mother, however, also indicated that her last arrest

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] A later drug screen was negative results for Mother and D.P.

[3] When interviewed, Father stated that his other child was detained from his mother because of her drug use but that Father was incarcerated at the time so the other child was never removed from his care.

was on January 1, 2014, for a DUI for alcohol and drugs and was consequently on probation. As part of her DCFS case for Josiah, Mother was required to randomly drug test, but had not called in to test in 2014.

When interviewed, Father indicated a criminal history with his last conviction towards the end of 2013 for possession of a methamphetamine pipe and as a result was on probation and attending Narcotics Anonymous classes. Father indicated his last arrest was a few months ago for possession of drugs but the case was rejected by the district attorney's office. Father admitted a drug history for methamphetamine and marijuana beginning 17 years ago, and stated his last methamphetamine use was when he was arrested for possession of the methamphetamine pipe and his last marijuana use was a few months ago. Before then he smoked marijuana on average three times a week at a friend's house. Father denied Mother participated in drug use with him and denied any knowledge of drug use by Mother.

Mother and Father stated they were evicted in April 2014 and were living in a motel before coming to the hospital for D.P.'s birth. A relative offered to have the family reside with the relative when D.P. was discharged. According to the Detention Report, Mother consented to DCFS detaining D.P. from Mother and releasing her to Father.

At the May 29, 2014 detention hearing, the juvenile court made detention findings and orders with respect to Mother and released D.P. to Father on the condition that they reside in the home of a maternal cousin or at another DCFS-approved location and that Father participate in on-demand drug testing and a drug rehabilitation program. The court granted Mother monitored visits, with the condition that Father not be the monitor.

On June 12, 2014, DCFS detained D.P. from Father. DCFS had been unable to locate Father and D.P. at the address provided and had been unable to reach Father for on-demand drug testing. DCFS eventually located Father, Mother and D.P. and learned that Father and D.P. were living together with Mother in motels in violation of the juvenile court's order that they live in a DCFS-approved location and Father was not to serve as Mother's monitor for visits. The social worker informed the parents that D.P. would be placed in the same foster home as her sibling, Josiah.

3

At the June 17, 2014 section 385 hearing, the juvenile court made detention findings and orders with respect to Father and removed D.P. from Father. The court ordered Father's visits to be monitored.

On July 15, 2014, DCFS filed a Jurisdiction/Disposition Report. When interviewed, Mother denied using drugs during her pregnancy with D.P. and stated she last used marijuana in March 2013 and last used methamphetamine in June 2013, prior to becoming pregnant. Mother denied using drugs when breast-feeding Josiah and D.P. and stated she was not currently using drugs. Mother stated she was attending drug program meetings and planned to enroll in an outpatient treatment program. Father stated that he had been in a relationship with Mother for about a year and that he saw her using marijuana but never saw her use methamphetamine. Father acknowledged a history of using marijuana and methamphetamine but stated that he currently did not have a problem with drugs. Parents reported that they had been visiting D.P. once a week and last visited her on July 4, 2014.

On August 11, 2014, DCFS reported to the juvenile court that Mother had tested positive for marijuana on July 24, 2014, and Father had tested positive on July 15, 2014. DCFS informed Mother that she could no longer breast feed D.P. Mother missed a drug test on August 4, 2014, and Father missed one on July 30, 2014.

At the jurisdiction and disposition hearing on August 13, 2014, the court amended and sustained the section 300 Petition, declared D.P. to be a dependent of the court, removed D.P. from her parent's custody, and granted Mother and Father reunification services. The court ordered Mother and Father to complete a full drug program, submit to drug testing, complete a parenting program, participate in individual counseling to address case issues, and to "verify a sober and stable lifestyle." The juvenile court ordered monitored visits for both parents, with DCFS discretion to liberalize. The court set February 11, 2015 for the six-month review.

For the February 11, 2015 status review report, the DCFS reported that parents were consistently visiting D.P. on a weekly basis. Mother was appropriate and engaged with D.P. during her visits. Father was arriving at some visits high and admitted to

4

smoking marijuana prior to the visit but stated that his medical marijuana card allowed him to smoke whenever he needed it. DCFS instructed the monitor to terminate Father's visits if he arrived under the influence.

According to the status review report, parents reported on January 7, 2015, that they had commenced their court-ordered programs, but did not provide proof of enrollment. DCFS attempted to verify Mother's enrollment but the program was unable to disclose Mother's information because she had not signed a release and another program verified Father's enrollment and indicated that it would provide a letter on Father's progress.

From May 2014 to October 2014, Mother was scheduled to drug test on 10 occasions; Mother tested negative on the first five dates, tested positive on the sixth date, and was a "no show" for the remaining dates. From June 2014 to January 2015, Father was scheduled to drug test on 15 occasions; Father tested negative for the first two dates, positive for three dates and was a "no show" for the other 10 dates.

DCFS reported that D.P. had bonded well with her foster parents and they had expressed an interest in pursuing adoption. The foster family was already in the process of adopting her half sibling, Josiah, and had an approved home study.

DCFS recommended termination of reunification services based on parents' lack of compliance and that the court implement a permanent plan for adoption.

At the six-month review hearing on February 11, 2015, the juvenile court set the matter for a contested hearing to be held on February 26, 2015. The juvenile court also signed an order designating the foster parents as the educational rights holders.

On February 26, 2015, the foster parents filed a request for de facto parent status with respect to D.P. D.P. had been placed with the foster parents for over eight months, since June 12, 2014, when D.P. was approximately three weeks old.

At the February 26, 2015 contested six-month review hearing, at which Mother and Father were present, the juvenile court found that both Mother and Father were not in compliance with the case plan and ordered family reunification services terminated. The juvenile court also granted the foster parents' request for de facto parent status. The court

5

set the matter for a section 366.26 permanency planning hearing on May 15, 2015. The minute order indicates that the court officer personally served parents with notice for the section 366.26 hearing.

On May 15, 2015, DCFS filed a section 366.26 report recommending termination of parental rights and that D.P. be placed for adoption with her foster family. DCFS reported that D.P. was adoptable and foster parents had an approved adoption home study for Josiah, which had been updated as to D.P. D.P.'s placement remained stable and secure and D.P. appeared comfortable and doing well in her placement.

DCFS also reported that parents continued to visit D.P. on a weekly basis in a neutral setting and no problems had been reported. Foster parents were not interested in formalizing a kinship agreement but were willing to maintain contact with parents after the adoption finalizes if they deemed it appropriate.

At the section 366.26 hearing on May 15, 2015, neither Mother nor Father were present. The juvenile court preliminarily noted that foster parents for Josiah and D.P. had decided not to proceed with finalizing their adoption of Josiah until the court decided whether to terminate parental rights as to D.P. so that the finalization for both children could move forward together.

The court then stated that "there is notice" as to the section 366.26 hearing for D.P. Both counsel for Mother and counsel for Father requested continuances because their clients were "not present," without argument or explanation for the absence. The juvenile court denied the requested continuances, noting "that's not good cause."

Counsel for both Mother and Father requested in the alternative that the matter be set for a contested hearing. As an offer of proof, Father's counsel noted that DCFS's report "indicates that the parents continue to visit with D.P. on a weekly basis" and "the visits are reportedly allowed without any problems noted" and therefore Father's counsel believed that further testimony "may be able" to show that "the parental child bond exception applie[d]" to the case. Mother's counsel joined in the request for a contested hearing, likewise noting that the DCFS report mentioned that both parents continued to visit D.P. "so with further testimony, it may be shown that there is a substantial bond

6

between the parent and child." The juvenile court denied the requests, noting that while the parents visited regularly, "we all know that visits in and of themselves, are insufficient to persuade the court, that it would be detrimental to terminate parental rights" and there was no other proffered evidence. Because the visits were monitored, Father and Mother "never moved on to a parenting capacity" and counsel's emphasis on the word "may" also suggested that it was speculative.

The juvenile court also noted that at a section 366.26 hearing, "[t]he focus shifts, not to the parents maintaining a contact with their child, but finding permanency and stability for the child." The court then found "by clear and convincing evidence it is likely that she will be adopted" and noted that her caretakers were providing for her care on a daily basis and she had been residing with the caretakers since a few weeks after her birth and in the same household as her brother, Josiah.

The juvenile court terminated parents' parental rights.

Mother and Father appealed.

## DISCUSSION

On appeal, Mother and Father contend the juvenile court abused its discretion by denying their requests for a continuance and their requests in the alternative to set the matter for a contested hearing as to whether a beneficial parent-child relationship existed. We affirm.

Section 366.26 governs a juvenile court's selection and implementation of a permanent plan for a dependent child. Once reunification services have been terminated, "'[f]amily preservation ceases to be of overriding concern . . . the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. [Citation.]'" (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) Section 366.26, subsection (c)(1) provides that if the court finds by clear and convincing evidence that "it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1); see *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 ["Adoption, where possible, is the permanent plan preferred by the

Legislature"].) The statutory preference is in favor of adoption, unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies, including that the juvenile court finds "a compelling reason for determining that termination would be detrimental to the child" because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child ""''promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."''' (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; accord, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689; see *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)

The juvenile court has discretion to continue the section 366.26 hearing. (*In re Michael R.* (1992) 5 Cal.App.4th 687, 694.) But, that discretion is guided and limited by section 352, subdivision (a), which provides in pertinent part: "Upon request of counsel for the parent . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

We review a denial of a request for continuance for an abuse of discretion. (*In re B.C.* (2011) 192 Cal.App.4th 129, 143-144; *In re V.V.* (2010) 188 Cal.App.4th 392, 399; *In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) Here, counsel for Mother and Father requested continuances because Mother and Father were not present without explanation

8

for their absence. In such circumstances, we do not find the trial court's denial of a continuance to be an abuse of discretion.[4]

When a parent seeks a contested hearing on the applicability of the beneficial parent-child relationship exception to the termination of parental rights, a juvenile court can require "an offer of proof to insure that before limited judicial and attorney resources are committed to a hearing on the issue, [the parent] had evidence of significant probative value." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122.) "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact. The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued. If the trial court finds the offer of proof insufficient and declines to hold a contested hearing, the issue is preserved for appeal so that a reviewing court can determine error and assess prejudice." (*Id.* at p. 1124.)

Here, Mother and Father's offer of proof was that DCFS reports showed that parents visited D.P. regularly and there had been no problems reported with the visits and testimony from the parents may show a substantial bond. This offer of proof does not meet the required "specific, setting forth the actual evidence to be produced." (*In re Tamika T.*, *supra*, 97 Cal.App.4th at p. 1124.) Moreover, at the time parental rights were terminated, Mother and Father had not provided for D.P.'s daily needs and care for the vast majority of her life. D.P. was almost one year old and had been living with her foster parents, who wanted to adopt her, since she was three weeks old. While the weekly monitored visits were reported to be without problems, such limited contact is unlikely to create the opportunity for Mother or Father to assume a meaningful and significant parental role. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 ["'the parents must show that they occupy "a parental role" in the child's life'" and "[t]he relationship that

---

[4] On appeal, Father also suggests that notice of the section 366.26 hearing was defective but counsel did not raise the notice issue below and the record shows that parents were present when the hearing was scheduled and personally served with notice so that Father would have been aware of the need to appear and participate.

9

gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences'"]; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 ["Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation"]; see *In re Angel B.* (2002) 97 Cal.App.4th 454, 466 ["[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent"].) Additionally, D.P.'s older sibling had been in the same foster home as D.P., allowing the siblings to bond with the foster parents as a family unit. The biological parents have failed to meet this standard.

## DISPOSITION

The orders on appeal are affirmed.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

LUI, J.

10